## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

KENNETH WRIGHT,

              **Plaintiff,**

              **v.**

CAROLYN COLVIN,
**Acting Commissioner of Social Security,**

            **Defendant.**

**No. 13 CV 06429**

**Magistrate Judge Mary M. Rowland**

## MEMORANDUM OPINION AND ORDER

Plaintiff Kenneth Wright filed this action seeking review of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI") Benefits under Title XVI of the Social Security Act, 42 U.S.C. Section 1381a et seq. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and the parties have filed cross motions for summary judgment. For the reasons stated below, the Commissioner's decision is affirmed.

## I. PROCEDURAL HISTORY

Plaintiff Kenneth Wright ("Wright") applied for Social Security and Supplemental Security Income benefits on January 14, 2011, claiming several combined disabling impairments. His claim was denied on April 1, 2011 (*id.*), and again on reconsideration on May 23, 2011. (*Id.* at 85). Wright then filed a timely

request for hearing on July 22, 2011. (*Id*. at 95). On June 7, 2012, Wright, represented by counsel, testified at a hearing before an Administrative Law Judge ("ALJ"). (*Id*. at 30-83). The ALJ also heard testimony from Richard Hammerson, a vocational expert. (*Id*. at 78-82).

The ALJ denied Wright's request for benefits on July 13, 2012. (R. at 15-29). Applying the five-step sequential process, the ALJ found, at step one, that Wright had not engaged in any substantial gainful activity since January 14, 2011. (*Id*. at 20). At step two, the ALJ found that Wright had several severe impairments: osteoarthritis, obesity, gout, sleep apnea, and status-post [sic] left inguinal hernia repair. (*Id*.) At step three, the ALJ determined that Wright does not have an impairment or combination of impairments that meet or medically equal the severity of one of the listed impairments. (*Id*.)

The ALJ then assessed Wright's residual functional capacity (RFC) and determined that he could perform light work with the following exceptions:

> lifting and carrying 20 pounds occasionally, 10 pounds frequently; walking, standing and sitting six hours in an eight hour day with normal rest periods and the need to alternate sitting and standing throughout the workday; occasionally crouching, kneeling and crawling; no working at heights, climbing ladders or frequently negotiating stairs; no operating moving or dangerous machinery; and being off-task 4% of the time in an eight hour workday.

(R. at 21).

At step four, the ALJ concluded that Wright was unable to perform any of his past work, but at step five, the ALJ found that Wright could perform jobs that exist

in the national economy in significant numbers. (R. at 24-25). Accordingly, the ALJ concluded that Wright was not suffering from a disability as defined by the SSA. (*Id.*).

On July 9, 2013, the Appeals Council denied Wright's request for a review of the ALJ's decision. (R. at 1-4). Wright now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561-62 (7th Cir. 2009).

## II. SEQUENTIAL EVALUATION PROCESS

To recover Disability Insurance Benefits ("DIB") or Supplemental Security Income ("SSI") under Titles II and XVI of the SSA, a claimant must establish that he or she is disabled within the meaning of the SSA.[1] *York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D. Ill. 2001); *Keener v. Astrue*, No. 06 C 0928, 2008 WL 687132, at *1 (S.D. Ill. March 10, 2008). A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1.      Is the claimant presently unemployed?

---

[1] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq*. The SSI regulations are virtually identical to the DIB regulations and are set forth at 20 C.F.R. § 416.901 *et seq*.

2.	Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?

3.	Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?

4.	Is the claimant unable to perform his or her former occupation?

5.	Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520, 416.909, 416.920; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

## III. STANDARD OF REVIEW

Judicial review of the ALJ's final decision is authorized by §405(g) of the SSA. The court affirms the ALJ's decision if it is supported by substantial evidence. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and

clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). In reviewing this decision, the Court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations. *Young*, 362 F.3d at 1001. Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.*

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). The Court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. The court remands the case "where the Commissioner's decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. MEDICAL EVIDENCE

Wright claims that his disability began on January 7, 2009. (R. at 143). On that date, Wright fell while on his way to his seat on a moving bus, and his left quadriceps tendon ruptured. (*Id.* at 222). Wright was diagnosed with tendon rupture, and left humoral condyle fracture with mild displacement. (R. at 219). The rupture was surgically repaired in March 2009. (Id. at 227-28).

On February 6, 2009, upon exam by his treating physician Dr. Brenda Jefferson-Byrd, Wright reported 10/10 pain for more than one month in his left leg. (R. at

239). He reported a past medical history of hypertension, type 2 diabetes, a previous bleeding ulcer, sleep apnea and his knee injury. (*Id*.) However, when asked if pain was affecting his activity level, Wright reported that it was not. (*Id*. at 243).

After the February appointment, Wright's hypertension and diabetes were noted throughout the Komed Health Center records. Wright's blood pressure was elevated at 160/98 on February 6, 2009, and pedal pulse ratings of 2 plus. (*Id*. at 238, 241).[2] Wright was prescribed multiple medications, including Flexeril (a muscle relaxant), Metoprolol Tartrate (a beta blocker), Lisinopril-Hydrochlorothiazide (for high blood pressure), and Glipizide (for diabetes).[3] (*Id*. at 241).

Wright then was seen regularly from August 2009 to March 2011. (R. at 243-434). Wright's blood pressure was elevated at 140/100 on August 7, 2009, and there was slight diminishment in his foot pulses. (*Id*. at 243-44). His prescriptions were continued, except for the muscle relaxant. (*Id*. at 245). Wright's blood pressure continued to be high at 142/88 on August 14, 2009, but the main concern at the appointment was diabetic foot care. Wright suffered from foot fungus related to his diabetes. (*Id*. at 247-48). On September 11, 2009, Wright had elevated blood pressure at 150/88, and on October 16, 2009, it was elevated again at 150/98, although on November 13, 2009 it was down to 138/94 (*Id*. at 253-61, 263). A new

---

[2] www.ncbi.nlm.nih.gov/books/NBK350/, "Examination of the Extremities: Pulses, Bruits and Phlebitis, last visited on August 11, 2014. A pulse of 3+ is a normal pulse in the foot. (*Id*.) A lower result is significant because "[p]eople who have diabetes are vulnerable to nerve and vascular damage that can result in loss of protective sensation in the feet, poor circulation, and poor healing of foot ulcers." (ndep.nih.gov/publications/PublicationDetail.aspx?PubId=116, last visited on August 11, 2014.)

[3] www.drugs.com/search, last visited on August 11, 2014.

prescription for Diovan likely helped reduced the blood pressure. (*Id.* at 262).[4]

Wright had follow-up visits with Dr. Murad Abdel-Qader for his foot care (*e.g., id.* at 265, 280, 304) and for refilling his prescriptions, during which his blood pressure was checked (*e.g., id.* at 275, 280, 284, 286). His blood pressure did come under control on certain dates (130/82 on April 9, 2010, and 140/80 on May 14, 2010) (*id.* at 289 and 297), but his diabetic foot care remained an issue; his pedal pulse was low, with a rating of 1 on September 10, 2010 (*id.* at 297, 321).

Wright also suffered from other ailments. Wright claimed that sleep apnea was part of his disability. He reported being treated for the disorder, using a CPAP machine and sleeping poorly. (R. 57-58, 239). Another significant issue was Wright's obesity. On August 7 and on September 11, 2009, Wright was found to have a body mass index of 38.66, indicating obesity.[5] (*Id.* at 243, 253). Wright was also found to be obese on follow-up appointments. (*Id.* at 255, 261, 275).

Regardless of the purpose of Wright's clinic visit, the notes from each appointment indicate that Wright was asked whether pain was affecting his activity level.[6] At almost every appointment Wright had where he was asked whether pain was affecting his activity level, he answered that it was not. (*E.g.,* October 16, 2009 (R. at 261); January 8, 2009 (*Id.* at 275); February 12, 2010 (*Id.* at 284); March 12,

---

[4] www.drugs.com/search.php?searchterm=diovan, last visited on August 11, 2014.
[5] For an adult, a body mass index of more than 30.0 indicates obesity. www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/index.html#Why, last accessed on August 11, 2014.
[6] Podiatry and dentistry visits excepted.

2010 (*Id.* at 286); and April 9, 2010 (*Id.* at 292). There was no discussion at any of these appointments about right or left knee pain.

The first time Wright complained of pain in his right knee was on May 14, 2010, at an appointment with Dr. Jefferson-Byrd. (R. at 294). Wright complained of a "burning" pain, which he stated he had experienced "daily" for a duration of "1-2 days," which was improved by Tylenol. (*Id.*) He also reported that the pain affected his activity level. (*Id.*) There is no indication in the records what caused this knee pain. This is the opposite leg than the one injured in the bus incident on January 7, 2009, Mr. Wright's alleged onset date. Wright also visited the doctor on this occasion for the removal of skin tags and moles, and asked for a referral for his varicose veins. (*Id.* at 294). At Wright's next three appointments, on June 11, July 9, and August 13, 2010, Wright reported to Dr. Jefferson-Byrd that pain was not affecting his activity level. (*Id.* at 301, 312, 315). On this last visit, Wright complained chiefly of back pain, and asked for refills on his medications. (*Id.* at 315). He was prescribed ibuprofen and extra-strength Tylenol for the pain. (*Id.*)

Again on September 10, 2010, Wright stated that pain was not affecting his activity level. (R. at 319). The doctor discussed "Self Management Goals" with Wright regarding his diet, getting exercise and "dealing with stress." There are no notes reflecting discussion of right knee pain. (*Id.* at 319-22). On October 8, 2010, Wright reported that pain was not limiting his activity level. (*Id.* at 324). Wright visited the clinic on November 12, 2010 for a refill of his prescriptions for ibuprofen, Metformin, Lovastatin, Diovan and Tenoretic (Altenolol-Chlorthalidone)(a beta-

blocker).[7] He stated that pain was not limiting his activity level. (*Id.* at 329). He also refilled medication and reported on December 20, 2010 and on January 21, 2011, that pain did not affect his activity level. (*Id.* at 333, 340).

In his Function Report, dated February 23, 2011, Wright stated that since his knee injury, he is only able to "walk up stair[s] one step at a time, must hold on to [the] bannister to support my weight, cannot run, must walk very slow. . . ." (R. at 175). Wright stated that he could slip easily on wet surfaces, that it was "hard to kneel to [the] ground and [get] back up," and that long drives were painful for his right knee. (*Id.*) He reported difficulty walking up stairs, (*id.* at 180), and that he would wake up with pain in his right knee (*id.* at 176). Despite the knee pain, Wright reported that one of his daily activities was to go for short walks. (*Id.* at 178-79). Wright stated that he took medication for his knee pain, and that it did not cause side effects, but he omitted the name of the medicine. (*Id.* at 182). Wright further reported that he was prescribed a cane and crutches after his injury in January 2009, and a walker after his surgery, but indicated that "I no longer use the cane, crutches or walker." (*Id.* at 181). He also stated that he cannot carry more than 10 pounds. (*Id.* at 184). To get up from a chair, Wright stated, he must hold on to the chair arm. (Id. at 185). He also stated that he can sit for only a few minutes before he must stand due to the pain in his right knee. (Id.) His knees cause him a lot of pain "[a]fter a long walk." (Id. at 185).

---

[7] www.drugs.com/search.php?searchterm=tenoretic (last visited on August 11, 2014).

On March 4, 2011, Wright visited Dr. Jefferson-Byrd and complained of right knee pain, this time at a level of 3 out of 10, having lasted for six months. (R. at 432). Wright described the pain as aching, occurring weekly, intermittently, and improving by use of heat, ice and a knee band. (*Id.*). Wright stated that the pain was interfering with his activity level. (*Id.*) Dr. Jefferson-Byrd noted that Wright still rode his bicycle for exercise and that there was no obvious swelling in the knees. (*Id.*) She also noted that Wright denied sleep disturbances. (*Id.*) Her assessment does not acknowledge Wright's right knee pain; instead, she assessed Wright with "knee pain, left, chronic as deteriorated," prescribed no additional medications, and told Wright to follow up in a month. (*Id.* at 433-434).

On behalf of the Commissioner, on March 19, 2011, Dr. Norbert De Biase examined Wright. (R. at 346-54). Wright complained to Dr. De Biase of pain in both knees, but more the right, as well as stiffness and swelling in both. (*Id.* at 346). Wright also told Dr. De Biase that he could sit for one-half hour, and stand for one hour, and that he preferred standing. (*Id.* at 347). Wright stated that he could lift and carry 15 pounds. (*Id.*). Wright also stated that he could walk 10 blocks. (*Id.*). Dr. De Biase found that Wright was able to walk 50 feet unassisted, without a cane or walker, with a minimal limp on his left side. (*Id.* at 348). Dr. De Biase also found that Wright had crepitus bilaterally in his knees, (*Id.*), and he noted that Wright had "mild difficulty performing toe, heel, squatting and tandem gait." (*Id.*) In compiling his report to the Bureau of Disability Determination Services ("DDS"),

Dr. De Biase reviewed all Komed records,[8] and the medical notes from Riverside Medical Center dated March 26, 2009. (*Id*. at 346). After Dr. De Biase's exam, Wright additionally underwent radiology examinations of his left knee and of his lumbar spine for purposes of disability evaluation. (*Id*. at 357-58). Those tests revealed an intact lumbar spine, and "minimal narrowing of the medial compartment in the left knee." (*Id*.)

Eleven days later, on March 30, 2011, Dr. Madison, a non-examining DDS physician, completed the Physical Residual Functional Capacity Assessment, and found that Wright could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, and stand or walk about 6 hours in an 8-hour day. (R. at 364). He based all of these conclusions on the March 19, 2011 report of the consulting physician Dr. De Biase, and the radiology examinations conducted several days later. (*Id*. at 364). Dr. Madison also found that Wright was capable of occasionally climbing ramps or stairs, although never ropes, ladders or scaffolds, and that he could stoop frequently, and kneel, crouch, and crawl occasionally. (*Id*. at 365). He found that Wright should avoid concentrated exposure to extreme cold and fumes, but could tolerate unlimited exposure to extreme heat, wetness, humidity, noise and vibration as well as hazards, such as machinery. (*Id*. at 367). Dr. Madison reviewed (1) Wright's medical records for his hospitalization March 26-28, 2009, for surgery on his quadriceps rupture; (2) one medical record from June 15, 2010; and,

---

[8] Dr. De Biase's report does not reveal the dates of the records he was provided.

(3) Dr. De Biase's report. (*Id.* at 370). Dr. Madison also noted that Wright walked without use of a cane or walker, based on Dr. De Biase's report. (*Id.* 364-65).

Wright reported to the SSA Field Office on April 29, 2011 that his disability was based on his obesity, including a weight gain of 25 pounds, and that his "right leg is knee is [sic] weaker" and that "occasionally I have severe back pain that does not allow me to get out of bed." (R. at 206). Wright also reported new limitations that he could not walk up and down stairs, that he could not run and that his "left leg buckles when walking causing me to fall." (*Id.*) Wright was being prescribed ibuprofen for pain, and Lovastatin (a cholesterol medication), Metformin (for diabetes), Atenolol (beta-blocker), Diovan (a high blood pressure drug) and Bupropion[9] (an anti-depressant). (*Id.* at 199). He also reported to the SSA officer that he has to watch the quantity of groceries he buys because "I cannot lift too much weight."[10] (*Id.* at 200). There is no mention of right knee pain in his various report updates provided to SSA contained in the record. (*Id.* at 157-59,160-66, 195-97,198-202, 204-05, 206-211).

On May 20, 2011, a non-examining DDS physician Dr. David Mack, affirmed Dr. Madison's opinion. (R. 371-73). Dr. Mack stated that Wright did not allege worsening of knee injury. (*Id.* at 373). Dr. Mack first observed that there was no medical evidence regarding the right knee, and the x-ray of the left knee showed "minimal narrowing of the medial compartment." (*Id.*). Dr. Mack then noted that

---

[9] Claimant reported a prescription for Dupropion, which name appears to be a misspelling.
[10] Wright also reported in his Function Report that he buys groceries only once a week, and cooks almost all his food at home. (R. at 177-78).

Wright walked without "an assistive device," and concluded that "appropriate limitations were provided" for in Wright's RFC. (*Id.*). There was no statement from any treating source for Dr. Mack to review. (*Id.*). Dr. Mack checked the box to indicate that "[t]he prior determination was substantively and technically correct." (*Id.*)

# V. DISCUSSION

Plaintiff raises four arguments in support of his request for a reversal and remand: (A)  the ALJ's credibility determination was defective; (B) the ALJ disregarded treating physicians' opinions and failed to articulate his reasons for doing so; (C) the ALJ failed to fully and fairly develop the record; and (D) the ALJ improperly relied upon his own inexpert medical opinion and disregarded the opinions found in the medical records. The Court addresses each argument in turn.[11]

## A.    *Whether the ALJ's Credibility Determination Was Defective*

The Plaintiff argues that the ALJ's credibility determination was defective because, in evaluating Wright's RFC, the ALJ relied upon the oft-criticized language that "claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. at 22). This is the same language that the Seventh Circuit has repeatedly described as

---

[11] The Plaintiff does not challenge the ALJ's RFC finding, or his finding that Wright could perform jobs that exist in the national economy in significant numbers.

"meaningless boilerplate" because it "fails to inform us in a meaningful, reviewable way of the specific evidence the ALJ considered in determining that claimant's complaints were not credible." *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012). "However, the simple fact that an ALJ used boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion if he otherwise points to information that justifies his credibility determination." *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir., 2013). The ALJ did that here.

In his decision, the ALJ summarized the findings of the DDS physician who examined Wright, which noted that Wright complained of pain in both knees, that Wright did not require a cane to walk, and that:

> Despite the alleged pain, he surprisingly admitted he was capable of prolonged walking, 10 blocks at a time. . . .
>
> Examination showed confirmed [sic] the claimant was able to walk 50 feet unassisted but with a left sided minimal antalgic gait and no cane; had mild difficulty performing toe, heel, squatting, and tandem gait; had no difficulty getting on and off the examination table; negative straight leg raising; normal grip at 5/5 in both hand[s]; normal dexterity in the hands; bilateral crepitus of the knees with no warmth and effusion; free, full and painless range of motion in all joints, except for limited right knee flexion. . . Dr. De Biase diagnosed injury to left knee, knee pain, diabetes, hypertension, hypercholesterolemia, sleep apnea and obesity.

(R. at 22-23).

The ALJ then summarized the DDS non-examining doctor's report, and the report on reconsideration. He also generally discussed the medical records from the health center Wright visited more than 25 times between 2009 and 2011, and noted

14

that it was not until March 4, 2011 that Wright complained of right knee pain that had lasted for six months (meaning it began in September 2010).[12] (*Id*.). The ALJ stated, however, that Wright did not complain of the pain to his treating doctor, Dr. Jefferson-Byrd, prior to March 4, 2011, despite a multitude of visits since his January 2009 accident. (*Id*.) "In fact," the ALJ continued, "the claimant reported on September 10, 2010 that pain was not affecting his activity level. There is no evidence of any treatment since December 2010." (*Id*.)

The ALJ then continued discussing the record, and concluded:

> Lastly, despite his alleged serious functional limitations, there is no evidence of ongoing treatment, physical therapy or medication other than Ibuprofen for pain that one might expect. The claimant's allegations are inconsistent with treatment records.
>
> In assessing his residual functional capacity, I do take into account the residual effects from the claimant's left knee surgery, the possibility that he developed right knee pain after favoring the left knee, mildly limited bilateral knee motion, crepitus, and significant obesity with a BMI of 38. There is no evidence that claimant requires a cane currently; he told Dr. De Biase that he used a cane but not anymore. He even admitted that he could walk for prolonged periods of time. The progress notes do not document why the claimant would have such a marked decline as apparently alleged. Hence I agree with the DDS physicians finding a restricted range of light exertion, lifting and carrying 20 pounds occasionally, 10 pounds frequently, walking, standing and sitting six hours in an eight-hour day with normal rest periods. I further find because of his obesity and knee crepitus cause [sic] postural limitations, reasonably requiring the need to alternate sitting and standing throughout the workday; tolerate occasional crouching, kneeling and crawling; and no working at heights, climbing ladders or frequently

---

[12] In fact, Wright had also noted knee pain on one other occasion, on May 14, 2010, complaining of burning pain for 1-2 days, which was improved by Tylenol. (R. at 294).

negotiating stairs. I further credit reasonable allegations of pain, which might interfere with concentration and preclude operating moving or dangerous machinery; and being off-task 4% of the time in an eight-hour workday.

As for the opinion evidence, I give significant weight to the DDS opinions of Drs. Madison and Mack that the claimant is limited to light exertion with postural limitations. . .

(R. at 23-24).

The ALJ's extensive discussion allows the Court to sufficiently analyze what the ALJ relied on when he concluded that Plaintiff was not entirely credible. *See Pepper*, 712 F.3d at 367-68. The ALJ analyzed the consulting physician's and DDS physician's reports, and also considered his treating physicians' records. The ALJ found only two reports of right knee pain complaints—one to Dr. De Biase, and one to Dr. Jefferson-Byrd—and the ALJ reasoned that the DDS physician's reports were well- founded. Because the Court can follow the ALJ's reasoning, and because the ALJ provided substantial evidence for his decision, the Court is not persuaded by Plaintiff's claim that the ALJ improperly selected evidence that would support his conclusion regarding the RFC. Rather, the credibility determination was supported with substantial evidence.

### B. Whether the ALJ Improperly Ignored the Opinions of Wright's Treating Physicians

Plaintiff argues that the ALJ improperly ignored the opinions of Wright's treating physicians, failed to articulate reasons for doing so, and selected evidence specifically that would support the ALJ's ultimate conclusion. (Pl. Mot. at 8-10). Plaintiff argues that "[t]he ALJ here did not even make an attempt to articulate

reasons for rejecting the opinion of the treating and consultative doctors. Instead, he just recites what is contained in the medical records, without explaining why those findings and opinions were not accorded either controlling or greater weight." (R. at 10-11). The Court agrees with Wright that the ALJ cannot ignore uncontradicted, dispositive medical opinions. The problem with Wright's argument is that he has not identified a single medical opinion by a treating physician that the ALJ ignored. Accordingly, this argument is waived. *Clarett v. Roberts*, 657 F.3d 664, 674 (7th Cir. 2011) ("We have repeatedly held that undeveloped arguments are considered waived"); *APS Sports Collectibles, Inc. v Sports Time, Inc.*, 299 F.3d 624, 631 (7th Cir. 2002) ("[I]t is not this court's responsibility to research and construct the parties' arguments, and conclusory analysis will be construed as waiver.")(quotation marks omitted). Moreover, having thoroughly reviewed the record, the Court cannot find a treating physician *opinion* that was disregarded. While discussion of treating physicians' *notes* could have been more extensive, the Court finds that the ALJ recited and gave proper weight to the relevant portions of the medical records.

In fact, the only significant evidence that contradicts the DDS physicians' reports is Wright's own hearing testimony. For example, the ALJ states that, "There is no evidence supporting a need for a cane," (R. at 21), despite Wright's testimony on July 7, 2012 that he uses a cane "off and on." (*Id.* at 49). The ALJ even engaged in the following colloquy with Wright:

> Q: And, how long, how far can you walk with the cane?

A:  I can walk with the cane. I never really –

Q.  You walk as much as you need to?

A:  Right.

Q:  Okay. Without it, you might be limited to a block you say?

A:  Right.

(R. at 50).

This exchange appears to contradict Wright's statements to Dr. De Biase on March 19, 2011 that he "used to have" a cane, but that currently he could walk 10 blocks. (R. at 347). The ALJ neither acknowledges the conflict, nor directly addresses the testimony.

Wright mentioned his right knee pain at only two doctors' appointments, and reported an ability to walk some distance when he met with Dr. De Biase. In his decision, the ALJ addressed each of Wright's physical complaints, and each significant piece of evidence about that complaint— with the sole exception being Wright's statements regarding the need for a cane—and the ALJ noted how the complaints to his treating physicians, throughout 2009 and 2010 did not address the main complaints Wright alleged before the SSA. While the ALJ is required to address all the medical testimony, including that of the Plaintiff provided at the hearing, the ALJ need not directly mention every piece of evidence. *Scheiber v. Colvin*, 519 Fed. Appx. 951, 957 (7th Cir. 2013). In any case, the ALJ's statement that "[t]here is no evidence supporting a need for a cane," (*Id.* at 21), may in fact have been an inartfully-phrased attempt to state that there is no medical record addressing the need for a cane.

Ultimately, the ALJ concluded that Wright was not credible, due to the contrast between Wright's testimony at the hearing and the records. (R. at 23-24). As discussed above, because the ALJ provided specific reasons and substantial evidence to support that conclusion, the Court will defer to his assessment.[13] *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (*citing Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007).

### C. The ALJ's Obligation to Develop the Record

Wright argues that the ALJ made findings regarding Wright's RFC "without referring or relying on a treating physician's opinion or an expert opinion that was based [on] a complete record." (Pl. Mot. at 11). Wright also argues that "the ALJ failed to obtain additional x-rays of the knee that Plaintiff had the most complaints of pain about, the right knee, and only referred to the x-rays of the 'better' knee." (*Id.*). Wright further states that the ALJ should not have determined his RFC without consulting a physician's evaluation, and having failed to obtain such an evaluation, the ALJ failed in his duty to develop the record. (*Id.*).

The ALJ is required "to make a reasonable effort to ensure that the claimant's record contains, at a minimum, enough information to assess the claimant's RFC and to make a disability determination." *Martin v. Astrue*, 345 Fed. Appx. 197, 201 (7th Cir. 2009); *see* 20 C.F.R. §§416.912(d). The Court generally gives deference to the ALJ regarding how much evidence is needed, even in cases where the claimant

---

[13] Wright does not appeal the ALJ's failure to address Wright's testimony that he feels the need to elevate his leg. Accordingly, this argument is waived. *Clarett v. Roberts*, 657 F.3d 664, 674 (7th Cir. 2011) (undeveloped arguments are waived).

is pro se. *Martin*, 345 Fed. Appx. at 202. "[A]n omission is significant only if it is prejudicial. . . . Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand." *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009) (citation and quotations omitted) (Adding that "a claimant must set forth specific, relevant facts—such as medical evidence—that the ALJ did not consider.") Wright was represented by counsel, and counsel did not inform the ALJ at the hearing that additional medical evidence should have been requested, and indeed, even in his brief the only specific evidence Wright cites as missing is an x-ray of his right knee. Yet Wright only complained to his treating physician of pain in his right knee on May 14, 2010, and on March 4, 2011. In light of the fact that no physician ordered an x-ray or other test of his right knee, it does not appear prejudicial that the ALJ did not do so.

The ALJ in this case had enough information to make a disability determination. He relied upon the RFC assessment provided by Dr. James Madison (R. at 363-70), which itself relied upon the report of the consulting physician, Dr. De Biase, and the examinations accompanying that report. Dr. Madison further relied on Wright's surgical records from March 2009, and one medical report from June 15, 2010. (R. at 370). The ALJ's reasoning that Wright's more extreme complaints at the hearing—such as only being able to walk distances with a cane, and needing to elevate his leg constantly—were not credible, is supported by the ALJ's reasoning, and is spelled out clearly for the Court.

Because the record contains adequate information for the ALJ to render an opinion, the ALJ was not required to request an additional physician's evaluation in order to assess the RFC. Here the ALJ elicited information from Wright regarding his right knee pain, and sought information from Wright regarding his daily life and how his right knee pain affects him. The ALJ was not obligated to also seek x-rays for Wright's right knee.

### D. The ALJ's Expression of his Medical Opinions at the Hearing

Last, Wright argues that in finding him not disabled, the ALJ relied upon his own inexpert medical opinion and disregarded the opinions found in the medical records. (Pl. Mot. at 7). In support, Wright points to a statement by the ALJ that: "I persuaded [sic] the claimant's breathing problems are more due to obesity than a definitive respiratory impairment." (R. at 24.) Wright has not claimed an impairment related to any breathing problems, however, so while this statement is troubling to the Court, the ALJ's comment did not affect the outcome of his decision regarding Wright's disability.

Wright also argues that the ALJ had no basis for finding that Wright could be off-task 4% of each day in a potential job. (Pl. Mot. at 7-8). Wright states that the ALJ provided no "explanation as to how [he] made that finding," (Id. at 8), however the ALJ did state that "I further credit reasonable allegations of pain, which might interfere with concentration and preclude operating moving or dangerous machinery; and being off-task 4% of the time in an eight-hour workday." (R. at 24). Without providing any basis in a medical opinion, the ALJ's assumption of a 4% off-

task period appears to rest on his inexpert opinion only. Again, the ALJ's assumption appears to be harmless error, as the Plaintiff has not argued that there is a greater timeframe that Wright would be off-task. In fact, there is no evidence in the record of a physician or other expert stating that Wright would be off-task at all. While the Court is concerned that the ALJ repeatedly provided his own inexpert opinion in this decision rather than relying on medical experts, we will not remand on this issue because it appears to be harmless error. *Patton v. Colvin*, 2013 WL 4024506, *4 (7th Cir. 2013); *Schreiber v. Colvin*, 519 Fed. Appx. 951, 960 (7th Cir. 2013) (reasoning that the ALJ's failure to address a year's worth of treatment notes was harmless error because the notes did not establish any fact in conflict with the ALJ's conclusion, and that the ALJ had not ignored evidence that contradicted his decision).

Finally, the Plaintiff argues that the ALJ's statements at the hearing regarding Wright's gout indicated reliance by the ALJ on his own inexpert medical opinion. (R. at 8). At the hearing, Wright testified that he had gout in his toes, and that he had been taking medication for it regularly for approximately two weeks, due to a flare-up. (*Id*. at 64). Wright also testified that he feels pain in his toes "every now and then." (Id.) The ALJ then responded that he had personally suffered from gout forty years prior, and that he had received medication and the gout did not return. (*Id*.) He added, further, that:

> But . . . you don't need to take any more medication unless
> it comes back. It never came back. But, what he told me
> was I would only have symptoms if I had a flare-up. That in
> between, once it goes away, you won't have anything in

between. I was thinking of what he told me and you're telling me something different. You're telling me there's no in between. You always have gout and you always have symptoms for it.

(R. at 65).

Again, the Court is concerned that the ALJ made a statement about his own understanding of gout symptoms, but the Court is not persuaded that the ALJ's statements, based on his own experience, are medical findings, and the Court finds that the ALJ relied upon substantial evidence in his findings regarding Wright's disability.[14] Further, the Court does not find any medical opinion regarding gout that the ALJ ignored.

## VI. SUMMARY

Although the ALJ's decision is imperfect, he has built an accurate and logical bridge from the evidence to his conclusion. The ALJ's decision was supported by substantial evidence, "and we must nevertheless affirm the denial of benefits even if

---

[14] Wright claimed disability in part based on gout, but despite the ALJ finding that Wright's gout was a severe impairment (R. at 20), the ALJ found that none of Wright's impairments were listed (*id*). Wright's evidence of disability based on gout is found in his hearing testimony that he had to elevate his leg because of his toe pain due to gout. (R. at 51). Wright further testified that he could also take pain medication for his toes, but that the medication made him feel drowsy. (*Id*. at 52). He testified that he took ibuprofen, but that a doctor warned him about that medication because Wright suffered from a bleeding ulcer as well. (*Id*.) Nowhere in the medical records or in Dr. De Biase's thorough physical examination record, (R. at 346-54), is there a notation of Wright's needing to keep his leg elevated, nor did Wright seek medical attention for gout or complain of gout. (*See* R. at 238-434; *but see id*. at 213) (In a letter to the ALJ, counsel referred to a complaint of gout in a medical record dated September 21, 2011, and stated it was located in exhibit 2F, but, after careful review, the Court is unable to locate that record.) In his decision, the ALJ did not specifically address Wright's testimony regarding the gout, however the ALJ did find Wright's hearing testimony not credible, based on substantial evidence. Plaintiff has waived any argument relating to Wright's disability based on gout, having failed to bring any such argument before this Court. *Clarett v. Roberts*, 657 F.3d 664, 674 (7th Cir. 2011) (undeveloped arguments are waived). In any case, the ALJ did make accommodations in the RFC for Wright's leg pain. (R. at 21-24).

'reasonable minds could differ concerning whether [Wright] is disabled.'" *Schreiber v. Colvin*, 519 Fed. Appx. 951, 962 (7th Cir. 2013).


## VII. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [14] is **DENIED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is affirmed.


E N T E R:

Dated: August 25, 2014

_____
MARY M. ROWLAND
United States Magistrate Judge